People of the State of Illinois, Plaintiff-Appellee, v. Frank Jackson, Defendant-Appellant.

Gen. No. 53,648.

First District, Second Division.

September 29, 1970.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Saul H. Brauner, Norman W. Fishman, and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Arthur Belkind, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE LYONS delivered the opinion of the court.

The defendant, Frank Jackson, was indicted for murder. In a jury trial, he was convicted of voluntary manslaughter and judgment was entered. After the defendant's written motion for a new trial was denied and a hearing in aggravation and mitigation was held, he was sentenced to fourteen to twenty years in the State Penitentiary. In this appeal the defendant contends that: (1) the trial court erred in overruling his motion to suppress his oral confessions; and (2) the minimum sentence is excessive and should be reduced.

Prior to trial, the defendant presented a written motion to suppress his oral confessions, given to certain police officers, on the grounds that admission of such evidence would "violate the due process clause of the Fourteenth Amendment of the United States Constitution and Article 2, Section 2 of the Constitution of the State of Illinois."

Testifying for the State at the hearing, before the court, on the motion to suppress were Sergeant Patrick Ward and Detectives Richard Sandberg and James Griffin, all of the Chicago Police Department. Testifying for the defendant was defendant himself, Louise Garner, Glenda Matute and Detective John Loftus of the Chicago Police Department.

Sergeant Ward stated that on June 28, 1967, at approximately 8:30 a. m., he was on duty at the bonding desk located on the first floor of Central Police Headquarters in Chicago when the defendant came in alone and told him: "I want to give myself up; I killed my girl friend on the West side." The defendant also stated that he was no longer armed. Ward searched him, found no weapon and directed him to sit in a chair behind the bonding desk. The accused was never handcuffed.

Continuing, Ward testified that the defendant then told him he had shot the deceased in his car while they were parked in an alley. He left her in the car and discarded the weapon in a garbage can located near his parked vehicle. This information was then verified by the Police Department. Ward stated that he then placed the defendant under arrest and gave him the Miranda warnings; namely, he had the right to remain silent; anything he said could be used against him in court; he had the right to have an attorney present during any questioning; and if he had no funds to hire an attorney, the State would obtain one for him. The defendant replied that he understood these rights.

In conclusion, Ward stated that at approximately 9 a. m. on June 28, 1967, Homicide/Sex Detectives Sandberg and Griffin arrived at Central Police Headquarters, and he told them that he had given the Miranda warnings to the defendant. The detectives then took the defendant

from Central Police Headquarters. Ward testified that he never struck the defendant and neither he nor anyone else in his presence ever made any promises or threats.

On cross-examination, Ward denied that when the defendant approached him he said that he merely wanted to report an accident nor that he ever said later that he wanted a lawyer and would say nothing further until he talked to an attorney.

Detective Sandberg testified that when he and his partner, Detective Griffin, met Sergeant Ward at approximately 9 a. m. on June 28, 1967, at Central Police Headquarters, they also met the accused who told them in response to their questions, that Sergeant Ward had explained his constitutional rights to him. Sandberg stated that he and Griffin then took the defendant out to their unmarked police vehicle, never handcuffed him, and drove to the homicide scene arriving there in about fifteen minutes. Continuing, Sandberg testified that, on the way to the homicide scene, he too gave the four Miranda warnings to the defendant who replied that he understood them. The accused never asked for an attorney but rather, on the way to the West side, told Sandberg what had happened in his car earlier that morning. Sandberg was told this only after he had advised the defendant of his constitutional rights.

After arriving at the homicide scene and remaining there for about fifteen minutes, the defendant stated that he wanted to be taken to St. Leonard's House in Chicago, which is a halfway house operated by the Episcopal Church for parolees. The accused wanted to go there to pick up his bankbook, his money, and tell the people he was in trouble.

Sandberg stated that at St. Leonard's House, Detective Griffin remained in the police car while he and the defendant met a woman behind the desk on the second floor. Sandberg testified that he heard the accused tell her that he wanted his bankbook and money as: "I'm in trouble; I killed Sally." From St. Leonard's House, they went to Area 4 Homicide. There in a room on the second floor, Sandberg testified that Griffin again gave the defendant the Miranda warnings and the

accused responded that he understood them. Thereafter, the accused gave them a detailed oral statement of the events preceding the homicide and when he was asked if he wanted to give a written statement to an assistant State's Attorney in the presence of a court reporter, the defendant responded by saying he would first like to speak with an Episcopal minister from St. Leonard's House. The police located Reverend Robert Taylor who arrived at the police station in about twenty minutes and spoke with the accused in private. The defendant thereafter refused to say anything further until he had talked to an attorney.

The testimony of Detective Griffin was essentially a corroboration of Sandberg's testimony.

For the defense, the defendant testified that he was fifty-three years of age at time of trial and when he spoke to Sergeant Ward on June 28, 1967, he told him that he wanted to report an accident as his girl friend was in his car and she had been shot. When Ward asked him who had shot her, the defendant said he replied that he would like to talk to an attorney before he made any further statements. Ward then told him he was under arrest, searched him and asked if he had a record. The accused said he was on parole at the present time.

Continuing, the defendant stated that neither Ward nor Sandberg nor Griffin ever gave him the Miranda warnings, and he was taken to St. Leonard's House after telling Sandberg and Griffin that he wanted to go there so he could obtain his bankbook and thereafter hire an attorney to defend him. While at St. Leonard's House he had a conversation with Louise Garner and Glenda Matute in the presence of both Sandberg and Griffin, but the defendant denied that he ever told either or both of the women that he had shot and killed his girl friend, Sally Strickland.

The defendant went on to testify that at Area 4 Homicide the two detectives asked him to tell them what happened that morning, but he allegedly said that he wanted to talk to a lawyer first. The detectives responded that he could speak to an attorney after he gave

them his oral statement. They called the Reverend Robert Taylor only after they had completed questioning him.

On cross-examination, the defendant stated that he had taken a bus to Central Police Headquarters and had not driven Sally Strickland to a hospital.

Louise Garner testified that she was office manager of St. Leonard's House on June 28, 1967, when she saw the defendant enter with two police officers. She was unable to say that Detectives Sandberg and Griffin were the two police officers who accompanied the defendant on the morning of June 28, 1967, but she did say that she asked the accused, in the presence of the police, what was the trouble and he replied: "There's some difficulty; I have come here to get my bankbook." When she asked the defendant the nature of this difficulty, he did not reply. She then suggested that he and the two police officers go up to the second floor and obtain his bankbook. She did not see them again.

Glenda Matute testified that she was a secretary at St. Leonard's House on June 28, 1967, when she saw the defendant accompanied by two police officers. She was unable, however, to identify Detectives Sandberg and Griffin as the two policemen who accompanied the accused on the date in question. She did say that she met these three people on the second floor of St. Leonard's House and when she asked the defendant what was the matter after he had asked for his bankbook, he replied: "I am in a little trouble." When she asked the policemen what was the trouble, one of them replied that the defendant had shot a woman. In conclusion, she stated that she did not recall the accused saying: "I shot and killed Sally Strickland." He did not tell her why he wanted his bankbook.

Detective John Loftus testified for the defense and stated that he was a homicide detective assigned to Area 4 and he saw the defendant for about two minutes near the noon hour on June 28, 1967. Loftus denied being present when the defendant allegedly gave an oral statement to Detectives Sandberg and Griffin in the Area 4 police station. He did admit giving contrary testi-

mony at the Coroner's Inquest, however, but said that he was merely testifying from a report made by Detectives Sandberg and Griffin who could not be present at the Inquest because they were out of town on an extradition matter. Loftus was impeached, however, when he admitted that at the Inquest he did not disclose that he was testifying from a report prepared by someone other than himself, but rather did testify at the Inquest that the accused gave his oral statement when he was sitting across the table from him; that he did not detect the odor of alcoholic beverages on the defendant's breath at that time; and that the answers given by the accused were coherent and distinct. Loftus also admitted that he could have sought a continuance of the Coroner's Inquest as he had done in the past, but he did not do so in this case.

At the conclusion of this testimony, the defense rested. The court then ruled and suppressed the oral statement made by the defendant at Area 4 Homicide but refused to suppress the oral statement made at Central Police Headquarters to Sergeant Ward; the oral statement made to Detectives Sandberg and Griffin on the way to the homicide scene; and the oral statement made to a woman at St. Leonard's House. These three oral statements were ruled admissible in evidence.

At the trial of the case before the jury, the State presented seven witnesses: James Talbert, the brother of the decedent; Sergeant Ward; Detectives Sandberg and Griffin; Patrolman Perry Miller; John Sadunas, a firearms examiner employed by the Chicago Police Department; and William Steurner, a pathologist. The defense presented five witnesses: the defendant and four character witnesses including Louise Garner, Glenda Matute, Reverend Robert Taylor and the defendant's foreman, Charles Andrews.

James Talbert, the brother of the decedent, testified that he saw his sister on June 27, 1967. She was fifty years of age and in good health. When he next saw her, she was dead.

Sergeant Ward repeated for the jury the testimony that he had given earlier to the court at the hearing on

the motion to suppress. Essentially, he stated that the defendant came up to him in Central Police Headquarters and told him that he wanted to give himself up as he had shot and killed his girl friend. After the accused had told him that the shooting had taken place in his car in an alley at a specific location on the West side of Chicago and that he had discarded the weapon in a garbage can about twenty-five yards from the car, Ward had this information verified. After receiving confirmation, he then contacted Area 4 Homicide, advised the defendant that he was under arrest, and gave him the four Miranda warnings. The defendant replied that he understood them. In about fifteen minutes, the defendant left Central Police Headquarters with Detectives Sandberg and Griffin.

Detective Sandberg testified that after he and his partner, Detective Griffin, picked up the defendant at Central Police Headquarters and took him to their unmarked police car, he sat in the back seat with the accused, while Griffin drove the police car. As they pulled away, Sandberg testified that he gave the four Miranda warnings to the defendant, who replied that he understood them. Sandberg said he then asked the accused if he wanted to tell them what had happened that morning and received an affirmative reply.

Sandberg testified that the defendant told him, in the police car on the way to the homicide scene, that the deceased had called him at his apartment early in the morning of June 28, 1967, and wanted to see him; that he picked her up in his car and they went to a hotel together where they registered and had sexual relations; that she then asked him for $15. They returned to his apartment while she remained in his car. When he went to his apartment, he took $20 and his revolver. He returned to her and drove the car to a parking lot about one block from his apartment and was parked there when Sally Strickland demanded more than $15, or she threatened to tell his parole officer about some parole violations. When she put her arm around him, she felt his revolver; and that he pulled it out, pointed it at her head, and pulled the trigger three times. It fired twice.

Continuing, Sandberg testified that they reached the homicide scene at this point in the defendant's oral statement. The accused pointed out his vehicle, a blue 1962 Chevrolet, which was parked in an alley near a parking lot. Sandberg then met Patrolman Miller who gave him an unloaded revolver and two shells for it. Sandberg identified People's Exhibit 1 as the weapon he had received from Miller.

Two expended cartridges were marked as People's Exhibit 2; a loaded cartridge with the initials "J. G." scratched on its head was marked Exhibit 3; and another "live" cartridge, with no distinctive markings on it, was marked Exhibit 4. Sandberg identified these items as having been given to him by Patrolman Miller at the homicide scene. His partner, James Griffin, had scratched his initials on Exhibit 3 and had done so in Sandberg's presence. Sandberg testified that when he showed the weapon to the accused, the defendant admitted that he had used it in shooting the decedent.

Continuing, Sandberg testified that he, his partner, and the defendant then left the homicide scene and went to St. Leonard's House at the request of the accused, where they spoke to one woman on the first floor who directed them to the second floor. Once there, another woman gave the defendant his property, asked him what was wrong and the accused replied that he had shot Sally.

In conclusion, Sandberg stated that after taking the defendant to Area 4 Homicide, he went on to the County Morgue and received a blue sealed envelope from Dr. Steurner which contained one pellet from the body of the decedent. He took this envelope to the Crime Laboratory after being told by Dr. Steurner that the second bullet was lodged too deeply in the sinuses to be able to remove it without mutilating the body.

Detective Griffin corroborated much of the testimony of his partner, Detective Sandberg, and also stated to the jury that the defendant had told him that after shooting his victim and discarding the weapon, he left his car in the alley and took a bus to Central Police Headquarters. Griffin also identified the four exhibits for the

People and stated that he took the murder weapon to the Crime Laboratory.

Patrolman Perry Miller testified that he was ordered to a specific alley on the West side of Chicago and there found a blue Chevrolet with a woman slumped over in the middle of the front seat. She had two bullet holes in her left temple and was leaning over toward the driver's side of the car with her head lying on top of the front seat. The doors and windows of the car were closed and there was nothing in her hands.

Miller went on to state that he found a gun in a garbage can in the alley approximately twenty yards from the vehicle. He identified People's Exhibit 1 as this weapon and said he delivered it to Detective Sandberg in the alley. He also identified People's Exhibit 2 as the two spent cartridges that were inside the weapon; Exhibit 3 as the shell in the gun that had been hit by the firing pin but had not gone off; and Exhibit 4 as another cartridge which was also in the gun.

John Sadunas, a firearms examiner employed by the Chicago Police Department, testified that as part of his duties he uses a microscope to make comparisons of fired bullets. He examined People's Exhibit 1 and said it was the weapon he had examined in the Crime Laboratory on June 28, 1967. He fired the weapon and compared, under a microscope, the expended bullet with the one received from the Coroner's Office in a blue sealed envelope. In his opinion, the bullets were fired from People's Exhibit 1.

William Steurner, a physician who on June 28, 1967, was a pathologist with the Cook County Coroner's office, testified that he conducted an external examination of Sally Strickland on that date and noted two bullet wounds on the left side of her head. Based upon the nature of the wounds and the powder burns, it was his opinion that the weapon was fired within three feet of the deceased. One bullet was recovered from the decedent's brain and based upon his observation, it was his opinion that the two bullets were fired from left to right and in a horizontal path. It was also his opinion that these two bullet wounds were the cause of death. In con-

clusion, he testified that the one bullet he removed from the decedent was placed in a blue envelope and was sealed and labeled. He then gave it to an officer from the Chicago Police Department.

The State recalled James Talbert, the brother of the deceased, who testified that she was right-handed.

For the defense, the defendant testified and admitted that he had twice been convicted of burglary and larceny and in 1948, he had been convicted in Chicago of two counts of rape and two counts of armed robbery, thereafter serving over eighteen years in the State Penitentiary for these crimes. He was paroled in July, 1966, through the efforts of St. Leonard's House and he went to live there. Thereafter, he worked to support himself and also met the decedent. He began to see her every night, she asked him for money, and he gave her at least $55 a week.

Regarding what happened in the car that morning, the defendant's testimony, if believed, indicated that the homicide was done in self-defense. He testified that after giving the deceased $15 in his car, she noticed that he had more in his possession and she asked for more. He refused, but she tore the pocket of his trousers in an attempt to get more money. He put his money in his other pants pocket and started his car to take her home. After going down the alley for about twenty yards, the decedent produced a pistol and pointed it at him. People's Exhibit 1 looked like this weapon.

With this weapon pointing at the accused, the deceased allegedly told him that she would kill him if he did not give her more money and nothing would be done about his death since he was on parole. Continuing, the accused told the jury that he then grabbed her arm or hand with his hand and heard a click. They started to tussle and he heard the weapon discharge, but he could not tell how many times it went off. The deceased became still and he saw blood running down her face. After driving his car a short distance in the alley, he stopped the car, got out, and saw a pistol laying on the seat. He picked it up and wanted to take it with him to the police as he was going to give himself up,

but then decided not to take the weapon with him since he was on parole and should not have any weapons. He discarded the gun in a garbage can and took two buses to Central Police Headquarters.

Continuing, the defendant testified that he told Sergeant Ward that he wanted to report an accident, that his girl friend was in his car and had been shot. When Ward asked him who shot her, the defendant replied that he wanted to talk to a lawyer, whereupon Ward allegedly placed him under arrest. In conclusion, the accused stated that he was right-handed and that he made no oral confession or statement to Sergeant Ward or to Detectives Sandberg and Griffin on the way to the homicide scene or to any one at St. Leonard's House. He also denied that any police officer ever gave him the Miranda warnings and that he ever purchased or obtained a gun while on parole.

Charles Andrews, the defendant's foreman, stated that the accused worked for him for about a year; that he was a reliable and sober employee who worked every day; and that he had a reputation in the community of being a peaceful and very quiet man.

Louise Garner and Glenda Matute both denied that the accused told both of them together or individually at St. Leonard's House that he had shot and killed Sally Strickland or any other woman. Louise Garner also testified that the defendant had a reputation in the community of being a peaceful man.

Reverend Robert Taylor, an Episcopal Minister and Executive Director of St. Leonard's House, testified that he met the defendant in prison after the accused had written to him requesting assistance when he appeared before the Parole Board. After gaining his parole, the defendant lived at St. Leonard's House for three months and then obtained his own apartment but continued to take his meals at St. Leonard's. In conclusion, this witness also testified that the accused enjoyed a reputation in the community of being truthful, honest and peaceable.

Initially, the defendant relies upon Miranda v. Arizona, 384 US 436, and urges that the trial court erred in deny-

ing his motion to suppress the three oral statements admitted into evidence against him. These three statements are respectively: (1) the oral statement he made to Sergeant Ward at Central Police Headquarters; (2) the oral statement he made to Detectives Sandberg and Griffin in the police vehicle on the way to the homicide scene; and (3) the oral statement he made to a woman at St. Leonard's House. This contention assumes that the oral statements given to Sergeant Ward and the woman came within the ambit of the Miranda decision. It is our opinion that the ruling in the Miranda case does not apply to these two oral statements because neither one was the result of custodial interrogation by the police. The statement given to Ward was purely volunteered, and the one given to the woman was not the result of any custodial interrogation by the police. Neither was it shown that the police and the woman were acting in concert against the defendant. From this record, just the opposite conclusion is apparent.

In Miranda, the court defined custodial interrogation to mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. Miranda v. Arizona, 384 US 436 at 444. Furthermore, the court expressly stated that its decision did not require that police officers stop and give the Miranda warnings to a person who enters a police station and states that he wishes to confess to a crime. Volunteered statements of any kind are not barred by the Fifth Amendment's privilege against self-incrimination.

In the case at bar, the oral statements given to Sergeant Ward and the women at St. Leonard's House were volunteered by the accused and were not the result of custodial interrogation. Hence, the holding in Miranda v. Arizona is not applicable to them. See also: People v. Savage, 102 Ill App2d 477, 242 NE2d 446 (1968) and People v. Lopez, 93 Ill App2d 426, 235 NE2d 652 (1968).

The most incriminating statement given by the defendant was that uttered in the police vehicle on the

way to the homicide scene. The holding in Miranda is applicable here since the accused had been arrested and was being interrogated by the police without the presence of an attorney. The prosecution thus had a heavy burden to demonstrate to the trial court that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Miranda v. Arizona, 384 US 436, at page 475. The recent case of People v. Morehead, 45 Ill2d 326, 259 NE2d 8, states at 331 that "such warnings were given at the outset of interrogation as Miranda requires it was not necessary that they be repeated every time and on every occasion anyone might subsequently talk with the defendant."

In our opinion, the evidence presented by the prosecution at the hearing on the defendant's motion to suppress amply indicated that he had been given the Miranda warnings on at least two separate occasions by two different police officers. He said he understood them and thereafter he indicated that he wanted to tell the police what happened on the morning in question. The accused stated that he never received the warnings from any police officer. In our opinion, the resolution of this conflict in the evidence was for the trial court to decide as the trier of fact at this voluntariness hearing. We are convinced that his decision is not opposed to the manifest weight of the evidence. The three oral statements were properly admitted into evidence.

The defendant also urges that the minimum sentence of fourteen years imposed in this case is excessive and should be reduced. We do not agree with this contention. The prosecution's evidence, believed by the jury, indicated that he kept a weapon in his room. The hearing in aggravation and mitigation indicates that the defendant has a past record of at least five felony convictions. A minimum sentence of fourteen years is within the statutory guidelines (Ill Rev Stats (1965), c 38, § 9–2(c)) and was proper punishment for the accused. We will not disturb the sentence. People v. Taylor, 33 Ill2d 417, 211 NE2d 673 (1965).

The defendant has filed three pro se briefs in this court. We have examined them and the record of proceedings and conclude that no error was committed by the trial court. The defendant was proved guilty beyond a reasonable doubt and the sentence is proper. The judgment is affirmed.

Judgment affirmed.

McCORMICK, P. J. and BURKE, J., concur.